IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| STRUCTURAL GROUP, INC. | * | |
| | * | |
| | * | |
| v. | * | Civil No. CCB-14-00078 |
| | * | |
| | * | |
| FYFE CO., LLC. | * | |
| | * | |

********

**<u>MEMORANDUM</u>**

Plaintiff Structural Group, Inc. ("Structural") filed this action for declaratory judgment and breach of contract against Fyfe Co., LLC ("Fyfe"), relating to a dispute about their respective obligations under a Private Labeling Agreement ("PLA"). Fyfe brought two counterclaims against Structural, also asserting declaratory judgment and breach of contract claims. Now pending before the court are Structural's motion for summary judgment (ECF No. 74) and Fyfe's cross-motion for summary judgment. (ECF No. 77). The motions are fully briefed, and no oral argument is necessary. *See* Local R. 105.6. For the reasons set forth below, Structural's motion will be denied and Fyfe's cross-motion will be granted.

**BACKGROUND**

Plaintiff Structural is a specialty construction, repair, and maintenance services company that is incorporated and headquartered in Maryland. Defendant Fyfe manufactures products used in construction strengthening systems, including Fiber Reinforced Polymer ("FRP") systems, for the repair and restoration of buildings. Fyfe is incorporated in Delaware and headquartered in San Diego, California.

Structural and Fyfe entered into a PLA, effective October 1, 2011, under which Structural agreed to buy FRP products exclusively from Fyfe to market and sell under its own name, and

1

Fyfe agreed to sell such products to Structural at prices agreed to in the contract. Specifically, the PLA provides that Structural's purchase obligations are to:

> [E]xclusively promote, purchase, install the Fyfe [T]yfo® FRP systems including all system compatible materials only as defined by the terms of this agreement and . . . not to compete with Fyfe or purchase from other vendors without prior written authorization from Fyfe during the terms of this agreement except where Fyfe Products are specifically excluded or not approved.

(ECF No. 78, Ex. 4, p. 4). For its part, Fyfe agreed to sell the products to Structural "at equal or better properties than outlined in the Product Data Sheets." (*Id.* at p. 2). The term of the PLA is five years, and two year written notice is required "if Fyfe intends not to renew the [PLA] at the expiration of the 5 year term." (*Id.* at p. 1).

The PLA also contains a provision granting Structural a two-year license (the "License") to use its patented method on pipe projects. (*Id.* at p. 2). Under this provision, Fyfe is obligated to pay royalties to Structural in the amount of a percentage of "the final collected contract value" of such projects. *Id*. If Fyfe does not intend to renew the License at the end of the two-year term, it must provide Structural six months' notice. *Id*.

In March 2013, Fyfe notified Structural that it did not intend to renew the License, and on October 1, 2013, the License expired. (ECF No. 78, Ex. 8). In the following months, Structural sought a new supplier of FRP materials for its pipe projects, and purchased several million dollars' worth of FRP products from third party vendors. (ECF No. 78, Ex. 15; *id*. Ex. 16, pp. 21-22).

Structural filed its complaint on January 10, 2014, bringing claims against Fyfe for declaratory relief and breach of contract. (ECF No. 1). In Structural's view, once Fyfe terminated the License, it was no longer obligated to purchase pipe products exclusively from Fyfe. *Id*. Structural seeks declaratory relief; in the event that it prevails on its breach of contract

theory, Structural seeks compensatory damages as well.  For its part, Fyfe brings declaratory judgment and breach of contract counterclaims against Structural.  (ECF No. 38).  According to Fyfe, Structural remains obligated to purchase FRP products exclusively from it, and Structural breached the contract by purchasing FRP products elsewhere.  *Id*.  Fyfe seeks declaratory relief and damages for lost profits.  Before discovery, Fyfe filed a motion to dismiss, or in the alternative, to transfer for improper venue; Structural filed a motion for summary judgment.  This court denied both motions.  (ECF No. 34).  Now, after discovery, Structural has renewed its motion for summary judgment (ECF No. 74), and Fyfe has filed a cross-motion for summary judgment.  (ECF No. 77).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Not just any factual dispute will defeat a motion for summary judgment.  A dispute is genuine if "a reasonable jury could return a verdict for the nonmoving party."  *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Id*. at 247-48 (emphasis in original).

The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in that party's favor.  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted).  At the same

time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotations and citation omitted).

## ANALYSIS

Structural moves for summary judgment on both its declaratory judgment claim and its breach of contract claim. Fyfe asserts that the court should find in its favor on Structural's claims, and moves for summary judgment on both of its counterclaims (also for declaratory relief and breach of contract). For the reasons that follow, summary judgment will be granted in Fyfe's favor.

**I.  Fyfe Did Not Breach the PLA, Nor Did the PLA Become Void for Lack of Mutuality.**

The issue at the core of this case is whether, after the License expired, Structural could buy FRP materials from vendors other than Fyfe without breaching the PLA. In its present summary judgment motion, Structural offers alternative theories as to why it can: first, that Fyfe breached its implied obligations under the PLA and thus repudiated the contract; and second, that once the License terminated, the PLA was void for lack of mutuality of obligation. By contrast, Fyfe argues that Structural remains bound by its exclusive purchase obligation because Fyfe did not breach the PLA, and the expiration of the License did not relieve Structural of that obligation. Fyfe further asserts that Structural breached the agreement by purchasing FRP elsewhere after the License expired. Each of these arguments will be addressed in turn.

**A.  Fyfe Did Not Breach Any Obligation to Act in Good Faith and Use Best Efforts to Supply Structural with FRP Products.**

Structural first claims that Fyfe breached the PLA, and so relieved Structural of its obligation to buy FRP exclusively from Fyfe. By terminating the License and by insisting Structural could not use FRP materials without the License, Structural argues, Fyfe breached its

duty to act in good faith and use best efforts under the contract. Fyfe disputes this, arguing that because the PLA expressly gave it the right to cancel the License, it breached no obligations by exercising that right. It further contends that warning Structural about potential patent violations was not tantamount to a breach of contract. Fyfe has the better argument.

To prevail on a claim for breach of contract under California law,[1] a plaintiff must prove: "(1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) resulting damage to the plaintiff." *Reinhardt v. Gemini Motor Transp.*, 879 F. Supp. 2d 1138, 1143 (E.D. Cal. 2012). California law provides that "every contract imposes upon each party a duty of good faith and fair dealing in its performance." *Carma Developers, Inc. v. Marathon Dev. Cal., Inc.*, 826 P.2d 710, 726 (Cal. 1992) (internal quotation marks and citation omitted). Courts have found a breach of that duty where a party engaged in conduct described as "inaction," "subterfuge," "lack of diligence," "evasion of the spirit of the bargain," and "abuse of power;" the covenant also may be breached by "objectively unreasonable conduct, regardless of the actor's motive." *Best Buy Stores, L.P. v. Manteca Lifestyle Ctr., LLC*, 859 F. Supp. 2d 1138, 1151-52 (E.D. Cal. 2012) (internal quotation marks and citation omitted). In addition, a requirements contract like the PLA in this case imposes upon the seller the obligation "to use best efforts to supply the goods," and the buyer the obligation "to use best efforts to promote their sale." Cal. Com. Code § 2306(2) (West 2002).

Fyfe did not breach its duty to use best efforts or its good faith obligations by cancelling the License. First, an implied covenant "will not be read into a contract to prohibit a party from doing that which is expressly permitted by the agreement itself," and the PLA provision governing the License expressly gives Fyfe the right to cancel the License. *Wolf v. Walt Disney*

---

[1] The parties agree that California law governs the PLA.

*Pictures & Television*, 76 Cal. Rptr. 3d 585, 597 (Ct. App. 2008); *see also 21st Century Ins. Co. v. Superior Court*, 213 P.3d 972, 982 (Cal. 2009) ("one cannot invoke the implied covenant to prohibit conduct that a contract expressly allows"); *Carma Developers*, 826 P.2d at 728 ("if defendants were given the right to do what they did by the express provisions of the contract[,] there can be no breach") (internal quotation marks and citation omitted). The License provision states that "Fyfe will provide Structural a 6 (six) month notice period if Fyfe intends not to renew the [License] at the expiration of the 2 year term." (ECF No. 78, Ex. 4, p. 2). This term makes clear that Fyfe has the right to allow the License to expire; the only restriction on this right is that Fyfe must give Structural six months' notice of its intent to do so. That is exactly what Fyfe did. More than six months before the end of the License's two-year term, Fyfe notified Structural that it did not intend to renew it. (ECF No. 78, Ex. 8). This court will not read an implied covenant into the PLA that would abrogate a right the agreement expressly bestows.

As to Structural's argument that the court should admit the testimony of Heath Carr to interpret the License provision,[2] I conclude that to do so would be inappropriate. The primary goal of contract interpretation "is to give effect to the parties' mutual intentions as of the time of contracting." *Shaw v. Regents of the Univ. of Cal.*, 67 Cal. Rptr. 2d 850, 855 (Ct. App. 1997) (internal quotation marks and citation omitted). When contract language is "clear and explicit and does not lead to absurd results," a court applying California law must "ascertain intent from the written terms and go no further." *Ticor Title Ins. Co. v. Employers Ins. Of Wausau*, 48 Cal. Rptr. 2d 368, 373 (Ct. App. 1995); *see also* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an

---

[2] A former Fyfe executive and an author of the PLA, Carr testified that Fyfe's intent in drafting the PLA to allow it to terminate the License was to prevent Structural from purchasing FRP materials for use on pipe projects. (*See* ECF No. 84, Ex. 30, pp. 87-89).

absurdity."); *id*. § 1639 ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"). And so California has a well-established rule against using "extrinsic evidence, whether oral or written, to vary, alter or add to the terms of [a contract]." *Casa Herrera, Inc. v. Beydoun*, 83 P.3d 497, 502 (Cal. 2004).

This is not a case in which the court would be justified in admitting extrinsic evidence to interpret a contract provision because that provision is "reasonably susceptible" to a party's proposed interpretation. *Thor Seafood Corp. v. Supply Mgmt. Servs.*, 352 F. Supp. 2d 1128, 1131 (C.D. Cal. 2005) (internal quotation marks and citations omitted). To the contrary, Structural's proffered reading of the PLA is wholly at odds with the clear language of the contract: although the PLA expressly permits Fyfe not to renew the License, Structural asserts that the PLA effectively *obligates* Fyfe to renew it. Structural would essentially have the court read Carr's testimony to show that the parties "meant something other than what they said" when they entered into the contract, "which is an improper use of extrinsic evidence." *Id*. at 1132 (internal quotation marks and citation omitted). Such an interpretation would furthermore render the six-month notice clause in the License agreement nothing but surplus, contravening California's rule "disfavor[ing] constructions of contractual provisions that would render other provisions surplusage." *Boghos v. Certain Underwriters at Lloyd's of London*, 115 P.3d 68, 72 (Cal. 2005). Accordingly, I decline to admit Carr's testimony to interpret the License provision.

Nor is the court persuaded by Structural's claim that Fyfe breached its good faith and best efforts obligations because by cancelling the License, it "render[ed] the FRP products effectively useless to Structural." (ECF No. 74, p. 17). This argument is built upon the flawed premise that Fyfe holds the position that Structural cannot perform any wet layup projects (the work for which FRP is used) without Fyfe's License. (*See* ECF No. 74, pp.1, 17-26; ECF No. 83, pp. 1,

7

5-12).  Fyfe does not now espouse that view, nor can the record be read to show that Fyfe has ever done so.

To the contrary, Structural and Fyfe *agree* that the termination of the License had no effect on Structural's ability to do wet layup work, and therefore use FRP product.  Structural's refrain, throughout its briefing, is that it "vigorously disputes that the License is required or necessary for Structural to use the 'wet layup' method."  (ECF No. 74, p. 1).  Likewise, Fyfe devotes a substantial portion of its briefs to demonstrating why, in its view, "the argument that the expiration of the License prevented [Structural] from [using] FRP materials . . . is a misrepresentation of fact and completely unsupported by the record."  (ECF No. 78, p. 29).  Indeed, Structural and Fyfe reference the same evidence to support their position: each points out that Structural's witnesses, including its CEO Peter Emmons, testified that his company did not need the License to do wet layup work because the process Structural uses is "[a]bsolutely . . . different" from Fyfe's patented process.  (ECF No. 78, Ex. 14, p. 32; *see also id*. at 28-29 (Emmons testifying that Structural "couldn't care less about the patent because it had no meaning to us . . . [w]e weren't violating it," and "we never used Fyfe's [patented] process . . . to install the product.")).[3]

It appears that the basis for Structural's mistaken premise is correspondence it received from Fyfe regarding two pipe projects on which Structural had submitted bids (the Baltimore Project and the Miami-Dade Project).  (ECF No. 74, Ex. 6; ECF No. 74, Ex. 7).  But the two letters on which Structural relies simply question whether Structural could perform work on

---

[3] This court need not determine whether the wet layup process Structural uses is the same as Fyfe's patented method.  This is not a patent infringement or challenge case, and the parties have presented no argument about the precise contours of Structural's process, let alone those of Fyfe's patent.  Indeed, both parties agree that Fyfe's patent, and thus the License, are not necessary for Structural to be able to use FRP to perform wet layup work.

those particular projects without infringing on Fyfe's patent, and caution Structural to "take care to avoid any unlicensed activity." (ECF No. 74, Ex. 6, p. 2; ECF No. 74, Ex. 7, p. 2). Nowhere in the letters does Fyfe adopt the position that Structural could not perform work on *any* wet layup project without the License. To the contrary, Fyfe indicates in each letter that "given the [particular project's] specifications, we believe Structural will have difficulty prosecuting its work on [that project] without infringing on Fyfe's method patent." *Id*. Structural's erroneous contention that Fyfe has challenged and would challenge any attempt to do wet layup work is further controverted by the fact that these two pipe projects appear to be the only ones about which Fyfe expressed concern—and there are at least 20 others on which Structural bid after the License expired. (*See* ECF No. 78, Ex. 18, pp. 11-22). Structural offers no authority for the notion that the PLA prohibits Fyfe from cautioning Structural against violating its patent. That Fyfe did so does not constitute a breach of the PLA.

Finally, to the extent Structural asserts in its reply that Fyfe "adamantly and repeatedly advised Structural that it would not sell Structural FRP that could be used with the 'wet layup' method" (ECF No. 83, p. 17), which it insinuates constituted an anticipatory breach of the contract, the court disagrees. Structural cites no evidence to support its contention that Fyfe was no longer willing to sell FRP to Structural. It may well be that Structural again relies on the two letters in which Fyfe cautions Structural against potential patent infringement, but the letters do not state or imply any refusal to sell FRP products to Structural. (*See* ECF No. 74, Ex. 6; ECF No. 74, Ex. 7). Indeed, as Fyfe points out, the only evidence on this issue contradicts Structural's claim: Fyfe's Director of Engineering Services testified that since the PLA became effective, Fyfe has never refused to sell Structural any product listed in the PLA, (ECF No. 78, Ex. 20); Fyfe reminded Structural in December 2013 of its "ongoing obligation to purchase *all*

FRP products necessary for Structural's business" until the PLA's 2016 expiration date, (ECF No. 78, Ex. 10); and after the License expired, Structural continued to buy at least some FRP from Fyfe, even while buying the majority of its FRP needs elsewhere. (ECF No. 84, Ex. 26).

For all of these reasons, Structural's argument that Fyfe breached and thus repudiated the PLA is without merit. The agreement unambiguously gives Fyfe the right to allow the License to expire, and Fyfe breached no duties to Structural by doing so. Furthermore, Structural's arguments that Fyfe rendered FRP product useless to Structural and refused to sell FRP product to Structural are not supported by the record. Accordingly, Structural is not entitled to summary judgment on its breach of contract claim.

> **B.     The Expiration of the License Did Not Invalidate the PLA for Lack of Mutuality.**

Structural asserts in the alternative that once Fyfe allowed the License to expire, the PLA lacked mutuality of obligation and thus became unenforceable. It argues that when the License expired, the PLA no longer obligated both parties to perform a definite promise—that is, Structural remained obligated to buy all of its FRP exclusively from Fyfe, but Fyfe was no longer obligated to supply those materials to Structural. This argument is essentially a recasting of the breach of good faith and duty to use best efforts arguments Structural has already made, and it fails for substantially the same reasons.

Under California law, one party's promise to buy all the goods it needs for business purposes, and the another's corresponding promise to supply those goods, "constitutes . . . valid consideration" for a requirements contract. *Fisher v. Parsons*, 29 Cal. Rptr. 210, 213 (Ct. App. 1963) (internal quotation marks and citation omitted). As such, without the mutual promises of the parties, the contract between them will be void for lack of mutuality. *Id*. Not so here. The premise of Structural's position is its contention that "[o]nce the License was terminated, Fyfe

asserted that it was no longer obligated to supply Structural with the FRP products for pipe projects it needed or required." (ECF No. 74, p. 29).  But as discussed previously, Structural cites no evidence showing that Fyfe has disavowed its obligation to sell FRP products to Fyfe.  Nor does Structural make any showing that Fyfe failed to supply any FRP that Structural ordered, or otherwise refused to sell FRP to Structural.

To support its claim that Fyfe renounced its contractual obligation, Structural cites to documents and testimony in which Fyfe references its ability to grant Structural a license to use its patented process on a case-by-case basis after the two-year License expired.  (*See, e.g.*, ECF No. 74, Ex. 2, ¶ 7; *id*. at Ex. G (an email in which Fyfe indicates that it "remains willing to offer a project-specific license to Structural (to be considered on a case-by-case basis) in order to allow Structural to execute pipe projects that require Structural's use of Fyfe's pipe patent.")).  From this evidence, Structural infers that "Fyfe, then, admittedly feels free to, whenever it wishes, withhold FRP products that Structural requires." (ECF No. 74, p. 30).  Structural overstates the facts.  It is clear from these documents and testimony that Fyfe is *not* asserting that it has the discretion to decide whether to provide FRP to Structural, but rather that it has the discretion to allow Structural to use its patent for pipe projects.

Furthermore, and perhaps more fundamentally, Structural fails to explain how Fyfe's termination of the License—which, as discussed above, the PLA expressly permitted—had any impact on Fyfe's obligation to supply FRP materials to Structural.  Structural cites no language in the PLA connecting the expiration of the License to the termination of the parties' FRP purchase/supply obligations.  Nor could it: the provisions governing the License and the parties' exclusive purchase obligations are separate and discrete, and the PLA does not state or otherwise imply that the termination of the License affects any other right or obligation in the PLA.  (*See*

ECF No. 78, Ex. 4, pp. 2, 4). Moreover, the PLA clearly states that the duration of the parties' purchase/supply obligations is five years (*id*. at p.1), and the duration of the License is two years. (*Id*. at p. 2). If the parties intended for the License and the parties' purchase/sale obligations to be coterminous, they would not have provided different terms governing the length of each, and certainly would not have included a provision granting Fyfe the right to allow the License to expire. Accordingly, Structural's argument that the expiration of the License extinguished Fyfe's obligation to supply its FRP requirement cannot prevail.

*   *   *

In sum, none of Structural's theories as to why it is no longer required to purchase FRP exclusively from Fyfe under the PLA have merit. Fyfe did not repudiate the agreement by terminating the License or cautioning Structural against violating its patent; nor did the PLA become void for lack of mutuality of obligation after the License expired. As such, Fyfe and Structural continue to be bound by their mutual obligations under the PLA—Structural to purchase FRP product exclusively from Fyfe, and Fyfe to supply Structural with that product. Structural is not entitled to summary judgment on either count in its complaint.

**II.  Structural Breached the PLA by not Exclusively Purchasing FRP Materials from Fyfe.**

In its cross-motion for summary judgment, Fyfe claims that Structural breached the PLA by purchasing FRP materials elsewhere. It is undisputed that Structural bought FRP from vendors other than Fyfe during the PLA's five-year term: after the License expired in October 2013, Structural bought several million dollars' worth of FRP from third parties. (*See* ECF No. 78, Ex. 14, p. 96; ECF No. 78, Ex. 6, p. 4; ECF No. 78, Ex. 15). Beyond arguing that it was permitted to buy FRP elsewhere because Fyfe repudiated the PLA and the PLA was void for lack of mutuality—arguments the court rejected above—Structural's final defense is that its

purchases fell within certain alleged exceptions to the PLA's exclusive purchase requirement. This argument is not persuasive.

First, the PLA contains no exception for FRP bought in the United States but intended for use overseas, as Structural argues. The PLA provides that its "Territories shall be limited to point of sale in the USA," and does not define the term "point of sale." (ECF No. 78, Ex. 4, p.2). Structural would have this court define "point of sale" as the intended destination of the product, but offers no authority to support this assertion. To the contrary, the term is typically defined as the place where the sale or transaction is made, not where the product is ultimately used by the purchaser. *See Kivo v. Blumberg Exelsior, Inc.*, 982 F. Supp. 2d 217, 221 (E.D.N.Y. 2013) (referencing common dictionary definitions of "point of sale" as "a place where retail transactions are made," or "relating to the place (as a check-out counter) where an item is purchased") (internal quotation marks and citations omitted); *see also Point of Sale*, *Black's Law Dictionary* (10th ed. 2014) ("The place or shop where a product is sold."). Moreover, nowhere does the PLA state or otherwise imply that FRP purchased in the United States but intended for use overseas falls outside the ambit of the agreement.

Nor does Structural cite any authority to support its contention that the agreement includes exceptions for FRP bought for testing, placed in inventory, or not yet received. As to products in inventory or not yet received, Structural argues that it "does not breach the PLA unless it *uses* the FRP in a way prohibited by the PLA." (ECF No. 83, p. 21). Again, however, it is not the ultimate *use* of the FRP materials that is relevant to whether a breach has occurred; rather, Structural's duties under the PLA included the obligation to purchase Fyfe's FRP products as defined by the agreement, without regard to the final use for which they were purchased. (ECF No. 78, Ex. 4, p. 4). As to purchases for testing, Structural makes the

conclusory argument that because other exceptions to the purchase requirement exist, "then there is no reason that FRP purchased for testing should be considered a breaching use." (ECF No. 83, p. 21). This court has found no authority for the proposition that because there is a specific exception made explicit by an agreement, other exceptions should also be recognized. The PLA provides only one exception to the exclusive purchase obligation— "where Fyfe products are specifically excluded or not approved," (ECF No. 78, Ex. 4, p. 4)—and it would be inappropriate to read an exception into the PLA where none exists.

For all of these reasons, no exception contained in the PLA provides the refuge Structural seeks to justify its purchase of FRP from third party vendors. Structural did indeed breach the PLA by failing to buy FRP products covered by the agreement exclusively from Fyfe, and summary judgment will be granted in Fyfe's favor on both of its counterclaims.

### III.   Damages

Finally, the court turns to the remedy for Structural's breach of contract. Fyfe claims it is entitled to damages under California Commercial Code § 2708(2) as a lost volume seller. Structural does not challenge that contention, and so concedes the point. *See Rao v. Era Alaska Airlines*, 22 F. Supp. 3d 529, 540 (D. Md. 2014) ("Plaintiffs appear to concede this point, as they have failed to respond to this argument.") (internal quotation marks and citation omitted); *see also Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (non-moving party's failure to address in opposition brief an argument raised in opening brief constitutes abandonment of claim). Even if Structural had not conceded the point, such damages would be appropriate: it is undisputed that Fyfe could have fulfilled all of Structural's FRP requirements during the term of the PLA, as well as those for its other customers during the same period of time. *See Nat'l Controls, Inc. v. Commodore Bus. Machines, Inc.*, 209 Cal. Rptr. 636, 642 (Ct. App. 1985) ("The lost volume seller must establish that had the breaching buyer performed, the

seller would have realized profits from two sales."). The full amount of Fyfe's damages is yet to be determined, however, as Structural has yet to supplement discovery regarding its most recent FRP purchases. Accordingly, the court will defer ruling on the amount of damages to which Fyfe is entitled as a lost volume seller until this issue is fully developed by the parties.

## CONCLUSION

For the reasons stated above, Structural's motion for summary judgment on its declaratory judgment and breach of contract claims will be denied. Fyfe's cross-motion for summary judgment on its declaratory judgment and breach of contract counterclaims will be granted; however, the Court will defer judgment on the issue of damages. A separate order follows.

_____8/30/2016_____          ____/s/_____
        Date                                                            Catherine C. Blake
                                                         United States District Judge